# Pittsburgh City *versus* Grier.

1. A city being in possession of a public wharf, within its limits, exercising exclusive supervision and control over it, and receiving tolls for its use, is bound to keep it in proper condition for use.

2. The corporation is liable for special injury maintained by an individual in consequence of its neglect to keep the wharf in order, and *case* may be sustained therefor.

3. It was not material whether the city had adopted ordinances for the regulation of the wharf, or having such, neglected to enforce them. The responsibility is the same in either event.

4. When the plaintiff has sustained injury from the neglect of a public duty which the defendant has impliedly promised to perform, either *case* or *assumpsit* may be maintained.

5. Where the injury was the immediate consequence of a peril to which the

[Pittsburgh City *v.* Grier.]

suffering party was obliged to expose himself in order to avoid the one arising from the negligence of the city authorities, it was sufficiently proximate to sustain the action.

6. A steamboat was landed, at a moderate stage of water, at a proper place at the Monongahela wharf at Pittsburgh, on which piles of iron metal 'had been lying for a longer time and nearer to the water's edge than was allowed by the ordinances of the city. The river afterwards rose and the boat struck on the iron, and to avoid such danger was backed into the stream, where it was struck by a floating body, and further injured and sunk: *Held*, that the wharf being under the exclusive control and regulation of the city authorities (whether rightfully or not, held not to be material), who derived a revenue from its use, the wharfage of the boat having been paid, the city authorities having been guilty of negligence in not having the iron removed, the corporation was liable in an action on the case to the owners of the boat for the injury sustained.

7. Though some other place on the wharf might have been more secure, the captain of the boat had a right to select the one in question which was at the time safe, the faith of the city being pledged to render it secure.

8. It was not material that the city authorities did not foresee the danger as likely to occur.

9. The parties in this case were not in the position of persons equally in fault. Though both parties had an equal opportunity of seeing the danger, they were not bound to equal degrees of vigilance. The city was responsible for extreme care of the wharf; the owners of the boat only to that common prudence which would keep it clear of a manifest peril.

ERROR to the District Court of *Allegheny county*.

This was *an action on the case* to April Term, 1849, by David A. Grier and Robert Duncan, owners of the Steamboat *Mary Ann*, against the Mayor, Aldermen, and Citizens of Pittsburgh. It was brought to recover damages for injuries sustained by the sinking of the steamboat Mary Ann, at the wharf in the city of Pittsburgh, in consequence, as was alleged on part of the plaintiffs, of the default of the defendants, in allowing a quantity of pig metal to lie for an unreasonable time upon the landing.

The declaration contained two counts. In the first, it was alleged that the wharfage of the boat for that occasion was paid. That the defendants, in their corporate capacity, were proprietors and seised of the wharf adjacent to the city, and exercised the entire control and regulation thereof, and had enacted ordinances for its control and regulation, one of which was, that all blooms and pig metal should be unloaded sixty feet from the water's edge on the *paved* part of the wharf, and thirty feet on the *unpaved* part, and ranked compactly at least three feet high; no boat to occupy for blooms and pig metal more than twenty-five feet fronting on the river; no metal to remain on the wharf more than three days, &c. It was further alleged that a wharf-master was elected; that a duty lay on the defendants in their corporate capacity to keep the wharf clear of obstructions, and to afford to boats a safe and convenient landing and anchorage. It was alleged that in December, 1848, a large amount of blooms and pig metal was unloaded, and allowed

to be placed on the *paved* part of the wharf, within thirty or forty feet of the water's edge, and ranged in piles occupying forty or more feet on the river, at a point where it was customary for boats to land,—and that through the negligence of the defendants, the metal was suffered to remain for twelve or fifteen days prior to the 9th of January. That the plaintiffs relied on the enactments and regulations, and upon the duty of the defendants, and upon their rights under the same—that their boat was landed on the 9th of January, at the only convenient and proper place open for it, and it being high water, it was brought up to the water's edge according to the usual custom. And shortly after, the water beginning to fall rapidly, the boat being over the metal piles, was forced in the night time backwards into a dangerous part of the channel, where it was struck by floating boats or lumber, and sunk.

In the second count it was alleged that the defendants in their corporate capacity had the control and regulation of the wharf,—also their demanding wharfage—their duty to keep the wharf in proper order, and to afford safe landing—that on or about the 3d of January, 1849, the defendants permitted several piles of blooms and pig metal to be placed on the wharf, in an improper place, and permitted it to remain for an unreasonable time—also, that on the 12th January the boat of the plaintiffs came to the wharf at the only convenient and proper place unoccupied; alleged the payment of wharfage, and that in a few days thereafter a sudden flood and heavy run of ice occurred; that to save the boat it was moved to the water's edge, and the water afterwards falling, and the boat being likely to founder on the metal on which it struck, was forced back into a dangerous part of the current, where it was struck by floating ice, lumber, or boats, and sunk.

The plea was, not guilty. The declaration was afterwards demurred to specially.

The case showed that the plaintiffs were the owners of the steamboat Mary Ann, which was insured by themselves at a valuation of $5000; that the said boat came into the port of Pittsburgh, and anchored at the Monongahela wharf, on the 9th or 10th day of January, 1849, the water being then at a stage of about four feet; that there were several piles of pig iron then lying on the beach, at a distance of about thirty-five or forty feet above the water's edge, and above the log which was placed at the low water line, and which was then visible; that the river commenced rising about the 15th day of January, and continued until it had attained the height of about twenty feet, the boat in question coming up with the increase of water, and keeping as near as possible to the water line. That on the night of the 16th or 17th of January, the river commenced falling rapidly, and it was necessary to back the boat referred to somewhat further out in the stream than the boats

above and below, in order to avoid one of the said piles of pig metal, lying at or near her bow; and that, while in this position, it struck on one of the piles of metal and was also struck near the water line by some floating body, probably a raft or coal boat, and a hole knocked in its side, in consequence of which it sunk; that it was raised again at an expense of about $420, and afterwards was sold for the sum of $3000.

The plaintiffs claimed that the loss of the boat was a consequence of the neglect of the wharf-master, in permitting the metal aforesaid to lie upon the wharf, in violation of an ordinance of the city, and that the defendants were therefore liable for the injury inflicted by the boat, raft, or other substance which impinged against their vessel.

On the trial of the cause, the plaintiffs gave in evidence the 1st, 5th, and 7th sections of an ordinance passed on the 21st March, 1842, relating to wharves and landings, and also the 3d section of another ordinance, of the date of July 29, 1844.

On the trial, exceptions were taken to the admission and rejection of evidence, which were, however, not remarked upon by the Court in the opinion. A number of points were submitted on each side.

SHANNON, President Judge, *inter alia* charged :—

The borough of Pittsburgh was incorporated by Act passed the 22d of April, 1794, and by a second Act of Incorporation, repealing the former, on the 5th of March, 1804.

By the last Act it was provided, "that it shall and may be lawful for the Burgess and Town Council, or a majority of them, by and with the consent and approbation of a majority of the taxable inhabitants, &c., to authorize any person or persons, owning lots bounded by the Allegheny river and Water street, on the Monongahela river, to build wharves and erect buildings thereon, opposite their respective lots, subject, nevertheless, to such rules, regulations, and restrictions, as the corporation may deem necessary for the construction of wharves within the limits of the borough. Provided, that such wharf or wharves shall be so constructed as not to *obstruct or impede the navigation of said rivers.*"

But this Act was virtually repealed by the Act of 18th of March, 1816, entitled an Act " to incorporate the City of Pittsburgh." By this last statute, " the inhabitants of the borough, as the same extends, and is incorporated, between the rivers Allegheny and Monongahela, *and also to the middle* of each of said *rivers*, and as far down the river Ohio, to such point on the same, at which two lines, one running down the middle of each of the said two first-mentioned rivers, shall intersect, &c., are hereby con-

stituted a corporation and body politic, by the name and style of
' The Mayor, Aldermen, and citizens of Pittsburgh' —having per-
petual succession—and they and their successors, at all times, for
ever, to have, possess, and receive, lands, hereditaments, *liberties,
franchises,* jurisdictions, &c., and by that name they are made
capable and able in law, to sue or to be sued, plead and to be im-
pleaded, &c., and for that purpose to have and use a seal."

And by an ordinance passed 24th August, 1816, it is declared,
" That if any person or persons shall erect, or attempt to erect, a
*wharf* or *wharves,* or any kind of building whatsoever, on the
bank of the Monongahela river, within the bounds of the city, it
shall be the duty of the Mayor, on information being given, to
remove all materials," &c. &c.

The 3d section of same ordinance declares, " That it shall be
the duty of *each and every person* who may have made any *fence,*
or other enclosure, or have *erected any building,* of what kind
soever, before the passage of this ordinance, to *remove* the same
within fifteen days' notice," &c., and in default that the street com-
missioner shall have it removed at the expense of the owner.

By section 4th, &c., the city dedicates and declares the said
ground and street to the "*public use,*" and for that purpose it be-
came, under proper regulations, free and open to the public.

Reference made to ordinance passed 7th September, 1816.

To show that it is a public wharf, &c., read Book of Ordinances,
*Layng* 321, 323, page 176–5–4. Ordinance passed 7th January,
1825, creating the office of wharf-master, section 5 ; and section 6,
pointing out *his duties.*

The Act of .31st March, 1836, relating to Duquesne Way,
throws light on the subject of public landings, for it declares, that
the space lying between Duquesne Way and low water mark of the
Allegheny river, shall for ever thereafter be occupied, used, and
employed as a *public landing.* And the Councils have full power
to make such rules, regulations, and by-laws, regulating the use of
the same, as they may think proper, not inconsistent with the
laws of the Commonwealth, &c. See *Layng's Ordinances,*
page 57.

He observed that it will be seen, from all that has been collected,
that this wharf is declared open for free and public use.

By the law of nature, and the civil law, the shores of navigable
rivers, as well as the shores of the sea, were free and open to every
body ; yet in all nations which have built their policy on the feudal
laws, such shores, and the tolls arising from landing thereon,
always belonged to the sovereign, as a branch of his royal prero-
gative. In England, the king had the right of appointing ports,
and having such right, the stat. of 4 Henry 4, ch. 20, was made to
strengthen and confirm that right. Restrictive regulations were

[Pittsburgh City *v.* Grier.]

afterwards enacted, which being found too narrow, by stat. of 14 Car. 2, c. 11, s. 14, power is given to the crown to assign, by commission, " all such further places, ports, members and creeks, as shall be lawful, for landing and discharging goods." And by same statute, all persons are prohibited to land or discharge goods, &c.," " but only upon such open place, key or wharf, as shall be so assigned."

The Constitution of the United States regulates commerce, as well between the States, as with foreign nations.

It will thus be seen that in England, between low water and ordinary high water of the ocean, and wherever the tide ebbs and flows, or in the navigable rivers, is part of the common highway, over which all citizens, and aliens, may sail. In that country, this is vested in the king; here it is in the Commonwealth. *There* and *here*, originally, goods might be landed *anywhere*, on permission from the owner of the adjacent land. *Now*, in both countries on account of revenue, and for other purposes, ports of entry are established, at which alone certain goods can be legally landed, except in case of storm and distress. In that country, and in this, the governments have exercised the right of building wharves, &c., for the improvement and convenience of trade, at the intermediate space between high and low tide, and beyond low tide.

In 1816, as we have seen, the defendants dedicated all the space between Water street and low water mark, to the public use; and it is paved down that far, as the evidence on both sides would seem to show; and actually used.

This is a public or common wharf, unto which all persons may come, under the proper and reasonable rules, to lade or unlade their goods, and has ceased to be what it was under the old borough charter, *juris privati*, or of a private nature. The right .to erect *private wharves* is taken away—the grant is repealed and the public use is declared. He further charged that under the laws of the United States, this has been declared a public port.

He further charged that the owners of a public port or wharf are of common right bound to keep it in repair. This is a consideration for the toll which they receive. That a corporation laboring under such obligation in respect to their wharves or docks, will also be liable for special damage to individuals, who may recover by action *on the case*: 1 *Hawk Pl. Cr.*, 76, 369 ; 2 *Ch. Cr. Law*, 333, 352-3 ; 603-4-5 ; 5 *Burr.* 2700 ; *Cowper* 86 ; 4 *Bl. Com.* 167. That this corporation having assumed the control and management of the wharf, became, at all events on payment of tolls, liable to keep the wharf or landing in proper condition. The question of payment of toll for the boat on the occasion in question, was referred to the jury.

Also that a wharf should be used only for the legitimate pur-

[Pittsburgh City *v.* Grier.]

poses intended by its construction and dedication to public use. That merchandise or lading may be permitted to remain upon it a reasonable time, according to the circumstances of the locality and the nature of the trade. But to allow it to remain 'beyond such reasonable time would tend to defeat the objects intended by its structure.

Also that if the defendants acted unlawfully or negligently in the matter, this did not excuse the exercise of ordinary care on the part of the captain and crew of the boat. That they were bound to take all reasonable precautionary measures to avoid collision with the metal, and he referred it to the jury to say, whether by remaining at the wharf they consented to take the risk of a probable rise in the river. Also, that the plaintiffs being common carriers, were bound in entering the port to act in conformity to its regulations.

He referred to the case of Bacon *v.* Arthur, 4 *Watts* 437, where an injury caused by reason of sand banks, occasioned by the construction of a dam, was considered actionable. He referred to the jury whether there was such neglect *on the part of the plaintiffs*, as no man of ordinary prudence and skill would have fallen into—or whether or not, in endeavoring to get clear of the metal, those in charge of the boat inevitably got into the position which occasioned the injury.

In December, 1852, verdict was rendered for plaintiffs for $6563.85.

There were thirty assignments of error; as to the more material ones, see the sketch of argument and the opinion of the Chief Justice.

NOTE.—The section of an ordinance relative to the wharf-master, passed on 2d March, 1842, provides that if a certain arrangement of boats designated be impracticable, the wharf-master shall have discretionary power as to the location of any vessel as long as the difficulty shall exist.

Sec. 2 of an ordinance of 15th of March, 1845: That every steam, keel, or flat boat, &c., shall land in such places, make fast in such manner, and remove from or to such landing-place as the wharf-master, each for his wharf, may direct.

*Williams* and *Hampton,* for plaintiffs in error.—In the first count is alleged a seizure by defendants, of the wharf, as their private property; the enactment of regulations; the payment of wharfage by plaintiffs; their right, *by reason thereof,* to a safe landing and anchorage; the duty of defendants to enforce their own regulations; the neglect of their officer, in permitting a pile of metal to lie on the wharf; the necessity consequent thereon of backing out

[Pittsburgh City v. Grier.]

and *exposing* themselves, and the injury inflicted, *in consequence* of that exposure, from a foreign body and from the said metal.

The second count alleges the wharf to be a *public one;* the control and regulation thereof, and the collecting of fees by defendants; their duty by reason thereof, and *their public duty* to remove nuisances and obstructions, and to afford safe anchorage thereat, *as a public highway;* the permitting and authorizing the deposit of metal at an improper place; the landing of plaintiffs; the necessity of exposure, in consequence thereof, and the striking and foundering on said metal.

It was contended that no sufficient cause of action was alleged in the declaration. That *case* will not lie where the foundation of the action is *a contract,* and the act complained of is a mere act of *non-feasance*: Livingston v. Cox, 6 *Barr* 360. That the *first* count was substantially in *assumpsit,* and could not be joined with the second count. It was said that in it was asserted a right, by reason of the payment, to a safe landing and anchorage. It was said that the law does not imply such a right. That a wharf is a place for loading and unloading, and the payment of wharfage implies only that privilege.

It was further contended that no *duty* on the part of the corporation arose out of the enactment of the ordinance,—that it was a mere private regulation, with which, as the property is alleged to be their own, they might dispense, and that no cause of action arose out of their neglect to enforce it: Boyland v. City of New York, *Sand. Rep.* 27; *Id.* 465.

It was contended that the cause of the injury was *too remote from the effect.* The consequence of the neglect to have the iron removed was the exposure of the vessel; and the consequence of the exposure an injury from a foreign body, with which the corporation had nothing to do, and which was not an obvious or necessary consequence: Morrison v. Davis, 8 *Harris* 171.

As to the *second* count. In this the obligation to remove the obstruction is charged as a public duty. If a municipal corporation is liable for an omission to repair or remove a nuisance from a highway, such liability exists only where the duty is absolute and due from it as a corporation: 1 *Hill* 580; Mayor of Lynn v. Turner, *Cowp.* 86.

It was also contended that if the wharf was private property, the plaintiffs' remedy would be *in assumpsit,* and not *in case.* It was said that *case* would not lie for a breach of any other than a common law duty, as in the case of an action against a carrier; and not on an allegation of mere *non-feasance* or neglect: 6 *Barr* 360.

It was further contended that no legal obligation to reserve the wharf exclusively for the use of boats had been alleged or

[Pittsburgh City *v.* Grier.]

proven; and also, that if the wharf be a public highway, the defendants would not be liable for an obstruction put upon it by a third person without their authority. Also, that if the piles of metal were exposed to view when the boat came to the wharf, and amounted to an obstruction, or likely to become so in any emergency, the boat should have been placed elsewhere; that there was ample room for it elsewhere when the boat arrived, and sufficient time after the rise commenced to remove it; and that the Court should have instructed the jury that it was the duty of the plaintiffs to have had it removed: 2 *Pick.* 176-7; 2 *Hall* 129. That if the officers of the corporation could have anticipated a rise in the river, the officers of the boat could also have anticipated it; and if negligence existed, the parties were *in pari delicto*, and that where such is the case, neither can recover; also, that if the boat was placed at the wharf without any direction from the wharf-master, the plaintiffs could not recover.

Further, if the boat was not over 150 tons burden, (the tonnage of the Mary Ann was 142 tons), and remained at the wharf more than seventy-two hours (Sunday not included) before the accident occurred, the plaintiff could not recover. This proposition was founded on an ordinance, and the argument was that if third persons can avail themselves of the neglect of the city to enforce their ordinances, such third persons must be held to the same strictness.

*Shaler, Stanton,* and *Gilmore,* were for defendants in error.— It was stated that the wharf-master was examined on the trial, and proved that at the time the metal lay on the wharf, he was otherwise engaged than in attending to his duties on the wharf. It was stated that the wharfage had been paid, and that the boat came in at the only place designated for boats which was then unoccupied.

It was said that there was no misjoinder of counts in the declaration. In both, negligence on part of defendants is charged. That in neither count is *the payment of wharfage* made the foundation of a right to recover. That it was placed on the ground of culpable negligence. In both counts it is declared that the wharf is a public one, and that the defendants by their relation to it were bound to keep it free from obstructions. Though a duty may arise out of the enactment of ordinances relative to the wharf, which are a notice to those engaged in the navigation of the condition in which the wharf may be found, yet there is a higher obligation than springs from such ordinances, imposing a duty which no regulations of its own will enable the corporation to avoid. It was the duty of the corporation, independent of its regulations, to keep the wharf in order as a safe landing; and it is answerable in an action on the case, for direct and particular

[Pittsburgh City *v.* Grier.]

damage sustained in consequence of its default. *Bradby on Distress* 132; 3 *Barn. & Ad.* 77, 23 *Eng. Com. Law*, 32; 21 *Wend.* 115; 1 *Hawk Pl. Cr.* 76, 369; 2 *Chit. Cr. Law* 333; 352–3; 603–4–5; 3 *Burns J.* 217; 5 *Burr.* 2700; *Cowp.* 86; 4 *Black. Com.* 167; 11 *Wend.* 543–4; 1 *Railway and Canal Cases* 712.

As to the allegation of the *remoteness* of the injury, it was said that the evidence showed that the boat struck on the metal piles, with such force that it would have sunk without any other cause. But to escape from the metal piles, those in charge of the boat were compelled to push it out into the current, where it was struck by a floating object. But if the injury was caused by the latter, it was contended that it was not too remote to sustain the action: Bacon *v.* Arthur, 4 *Watts* 437; Mayor of New York *v.* Bailey, 2 *Denio* 433; *Cowper* 86; 7 *Mass.* 169; 9 *Watts* 119, 4 *Id.* 119; 2 *Watts* 26; 2 *Wharton* 539.

It was said that there was no other place on the wharf to land than that occupied by the Mary Ann.

In an action for dockage and wharfage of a public port the defendant may show that the port and wharf were out of repair, whereby he sustained damage: 21 *Wend.* 110.

The owners of land on the rivers Delaware and Schuylkill have the right to the land between high and low water marks; subject to the right of the public to pass over it in vessels when covered with water: 2 *Wharton* 539.

For an act of Providence alone the defendants would not be answerable. To fix them with liability for injury done by a flood or storm, there must have been a concurrence of negligence with the act of Providence; and it is for the jury to inquire whether they have used all proper precautions to prevent consequential injury: 4 *Rawle* 10; 9 *Watts* 120–1. An action on the case lies on the custom of the realm, against the master of a house, if a fire, accidentally kindled in it, consume the house or goods of another; and this although kindled without the knowledge of the master, and by a servant, guest, or any one else who has entered by his consent: 1 *Rol. I. I.* 25; 3 *Lev.* 359; 1 *Salk.* 319; 4 *Rawle* 24.

The opinion of the Court was delivered, September 28, by

BLACK, C. J.—The vessel of the plaintiffs below, anchored at the Monongahela wharf, when the water was very low. The river rose afterwards, and the vessel was totally wrecked in consequence, as the plaintiffs allege, of certain piles of pig iron which had been negligently permitted to lie on the wharf, a foot above low-water-mark, which became covered by the water as it rose, and which compelled the Mary Ann to back out into the stream, where she

was struck and stove by some floating body, and sunk across the water log of the wharf, where she broke in two.

Ever since 1816, Monongahela landing has been under the control and supervision of the city corporation. The ordinances of the councils passed in that year, forbade the erection of any private wharf, declared the space between Water street and low water mark to be public property, authorized the appointment of an officer to take charge of it on behalf of the city, and required the payment of wharfage by such vessels as would use it to lade and unlade their cargoes.

The right of the city corporation to take the wharf into their keeping, and to charge a toll or fee for its use, is not denied. The dedication of it to public use by the original *proprietor* in his plan of the town, the provisions of the city charter, and the uniform exercise of the right for nearly forty years, would have effectually silenced such an objection if it had been made. But the city authorities could not with any grace assert that they had usurped a power forbidden by law, and their adversaries, so far from affirming it, aver the direct contrary in their pleading and in their argument. It is unnecessary, for another reason, to investigate the legal origin of the power which the city claims over the wharf. In actions like this for the neglect of a public duty, whether against a corporation or an individual, the inquiry is not whether the defendant is *rightfully* in the enjoyment of the franchise out of which the duty springs, but whether he does *in fact* enjoy it.

The city being in possession of the wharf, exercising an exclusive supervision over it, and receiving tolls for its use, is it a violation of the duty which the corporate authorities owe to the public to let it get out of repair? The affirmative of this was decided in an action on the case against The Mayor and Burgesses of Lyme Regis (3 *Barnw. & Adolphus* 77), and by the Supreme Court of New York in several cases (11 *Wend.* 543; 21 *Wend.* 115). The general rule undoubtedly is that those who have a public work under their control, are bound to repair it, and the force of this obligation is still further increased when it yields its possessors a revenue. The cases above cited show that this principle applies to public ports in the possession of a city, as well as canals, bridges, and other highways in the hands of individuals and private corporations. There is no reason, nor no authority, for any distinction. The interests of commerce imperatively require that the place to which vessels are invited to come should be in a safe condition. Nobody but the city of Pittsburgh can possibly keep her port in order, for she alone has it in charge, and permits no one else to meddle with it; and it is justice that she should take the burden, because she receives the only direct profit which it yields.

How is the performance of this duty to be enforced? and how

[Pittsburgh City *v.* Grier.]

shall it be punished if neglected? Lord TENTERDEN (3 *B. & A.* 77) says by indictment for the public wrong, and by action for the special injury to individuals. The same answer is given to the question by Judge NELSON (11 *Wend.* 543), and by Judge COW-AN (21 *Wend.* 115); and the former sustains his opinion by a citation of numerous authorities.

It is a mistake to suppose that the right of action is based on the city ordinances, or that the wrong committed consists in a neglect to enforce them. The injury is a violation of the duty which arises out of the control which the city has over the port, and her receipt of tolls from the vessels which come into it. It is no matter whether that duty remains unperformed because she has no ordinances on the subject, or because having ordinances, she neglects to enforce them. The responsibilities of the corporation are the same in either case. The ordinances passed from time to time on the subject, are strong evidence to show how and by whom the port is controlled and regulated; but if the same fact had been otherwise proved, it would have had the same effect.

For reasons which will be apparent presently, we do not think it necessary or proper to comment on each minute point of the criticism to which the counsel for the plaintiff in error has subjected the declaration. But the argument that the form of the action has been misconceived, and that it should be *assumpsit* instead of *case* (technical though it be), is on a question important enough in practice to demand some notice. The rule deducible from the authorities is that when the plaintiff has suffered injury from the neglect of a duty which the defendant has impliedly promised to perform, the action may be either way. Thus *case* was sustained against an attorney for neglecting to recover a debt (6 *Barr* 361), and against the owners of a stage-coach for an injury to a passenger (4 *W. & Ser.* 179). In the latter case it was said that the plaintiff had his choice to bring *assumpsit* on the contract, or *case* as for a breach of duty. The same point had been previously decided the same way by this Court (6 *Watts* 10), as well as in England (12 *East* 534). It is not open to the slightest doubt.

The point which comes more near than any other to being a substantial defence is that the destruction of the plaintiffs' boat was so remote a consequence of the negligence complained of that no recovery ought to be allowed. It is certainly true that compensation for an injury can be demanded only from those whose acts and omissions have *directly* caused it. We cannot link a series of accidental events together, and follow the chain back as far as we can connect it. The law will not calculate the propulsion of causes on causes, and make him who set the first in motion, liable for the damage produced by all. But the application of the maxim, *causa proxima non remota spectatur,* is often very diffi-

cult. The books contain no exact rule to determine what is a remote and what a proximate cause. Each case seems to have been decided as it arose on its own special circumstances. In Morrison *v.* McFadden the lameness of the horse was so palpably not the cause of the disaster, and the breaking of the dam by which the boat was swept away was so clearly the true, and in legal contemplation the only cause, that the question there was very simple and plain. So, also, it was easy enough to decide, as Lord ELLEN-BOROUGH did in Livie *v.* Jansen (12 *East* 648), that when a ship at sea is so damaged by a storm, and her rate of sailing so reduced that she is unable to escape the cruisers of a public enemy, and thus comes to be taken, the loss is by capture and not by perils of the sea. In both these cases, the connection of the remote with the immediate causes was merely fortuitous, and the former might very well have happened without the latter. But a cause is not too remote to be looked to merely because it produces the damage by means of intermediate agency. Where the injury was the immediate consequence of some peril to which the suffering party was obliged to expose himself in order to avoid the one for which he sues, it is proximate enough. The familiar doctrine of marine law which requires the payment of general average, is an instance of this. So if a vessel, insured only against the barratry of the master, is exposed to capture by a barratrous deviation, the underwriter is liable on the ground that the deviation occasioned the loss (*Cowper* 153), and this though there was no immediate connection between the deviation and the capture (1 *Johns.* 229). Where the barratry consisted in cruising contrary to orders, and the cargo was lost in a storm which would not have been encountered but for an attempt to take a prize into port, the violation of the orders, and not the storm, was declared to be the cause to which the loss was referable (6 *T. R.* 379). A ship was captured, and after being detained for some time, was allowed to proceed, but, during the detention, the port to which she was destined was closed by a blockade, and it was held that the loss of the voyage was a consequence of the capture, though it would have been accomplished except for the blockade (9 *East* 283). In a case very nearly similar, the same doctrine was adopted and laid down by this Court (5 *Binney* 412). A ship insured against sea risks, is compelled to put into a port where funds to repair her can be had only by drawing bills at a heavy discount: the underwriters are liable for this sacrifice as a consequence of the peril insured against. And the owners of a cargo insured against perils of the sea, may recover from the insurers for the loss of so much as is plundered by the inhabitants of a country where the ship is driven ashore in tempestuous weather (*Stevens on Average* 155).

All these losses were occasioned by causes greatly more remote

[Pittsburgh City *v.* Grier.]

than that which is here alleged to have produced the wreck of the plaintiffs' boat. The negligence of the city authorities in leaving a pile of pig iron on the wharf made it necessary for the Mary Ann to back out into the stream in order to avoid immediate destruction. If she had not done so, the defence would doubtless have been set up that she was mismanaged by those who had charge of her. To prevent her from settling down on the iron as the water sunk, by which she must inevitably have been broken in two, she was shoved out and exposed to another danger, not then apparent, but in its results equally disastrous. How this can be called a remote consequence, in the face of the authorities I have cited, is not very easy to see. It followed as an absolute necessity from the effort to get clear of the direct danger. The defendants were bound to furnish the plaintiffs with a secure port. They ought to have performed that duty with vigilant fidelity. But it was done in such a manner that they might as well have received the fee, and then refused the boat a landing altogether. They are held to a responsibility at least as strict as if they had been insurers of the vessel against all dangers from which a well regulated port in good condition would have saved her. Who can doubt that she was wrecked simply because she had not a good landing-place?

It is said, however, that though this part of the wharf was not safe, other parts were; and if the master of the boat chose to adopt a dangerous place when he might have had another which was secure, he brought the disaster on himself. But he had a right to land at any part of the wharf. He chose the place most convenient for discharging his cargo. He had the faith of the city pledged that the place he anchored at, was one where his vessel might lie as securely as at any other. If, therefore, it suited him better in other respects, he had a right to take it.

It is argued that the destruction of the boat was a consequence which the agents of the city could not have foreseen as likely to occur, and because they did not expect it, they are not answerable for it. But it is not the law, that men are responsible for their negligence only to the extent of the injuries which they knew would result from it. If it were, there could be no recoveries except for malicious wrongs. This injury was produced by the iron on the wharf. The question in the cause was whether the loss should fall on the city, whose duty it was to remove the nuisance, and who had the right and power to do it, or on the owners of the boat, who were under no such obligation. Every principle of law and justice requires that it should be borne by the former and not by the latter party.

It is insisted that the plaintiffs might have seen the danger as well as the defendants, and that one party was as much bound to

[Pittsburgh City *v.* Grier.]

avoid it as the other was to remove the cause.    It is true, that where a person brings an injury on himself by his own inexcusable default, he cannot recover compensation for it from another whose negligence concurred with his own in producing it.    But the rule is inapplicable to this case : for even if we assume that both parties had equal opportunities of seeing and understanding the danger, they were not bound to equal degrees of vigilance.    The city was held to the utmost care of the wharf ; the owners of the boat only to that common prudence which would keep them clear of a manifest peril.

It is asserted on the paper-book that the Court below committed twenty-two several errors on the trial of the cause.    None of them are specified according to the rule of Court.    We have considered with care every point presented by the record which we deem important.    Those minor objections to the judgment which have no bearing on the merits of the case must be taken as waived, for the reasons given by Mr. Justice Lewis in Bryce *v.* The Farmers' and Drovers' Bank, decided last week.

Judgment affirmed.